

Exhibit F

# Truth in Advertising: An Ethics Case Study

By the AILA Ethics Committee

## Introduction

Social media provides many marketing opportunities for attorneys. Live videos, informative Facebook posts or tweets, TikTok videos, catchy Instagram pictures, or the perfect hashtag can be useful marketing tools. Used correctly, these social media tools provide potential clients a direct pathway to you and your services. Given the informal nature of these tools and ease of distribution, it is easy to forget that social media messages are communications, subject to applicable rules governing communications about legal services.

Social media advertisements that discuss legal remedies in a limited context can lead to unintended misrepresentations and sow confusion or misinformation among immigrant communities about eligibility for these remedies. In addition, it can set the client-lawyer relationship on a precarious path.

This article will provide a framework of relevant ethical considerations and potential liabilities, both disciplinary and civil, that immigration attorneys must consider when engaging with social media platforms while advertising for legal services. While this note highlights the Violence Against Women Act (VAWA) process, this framework can be applied to other forms of relief.

Additionally, this article will address ethical considerations through the consultation and intake process for potential VAWA cases. Conflicts of interest and issues surrounding confidentiality should be forefront in attorneys' minds when assessing a potential client's VAWA case. While these ethical issues should always be considered, doing so may be especially prudent for attorneys who have used or will use social media platforms and advertisements when communicating about VAWA.

## An Immigration Lawyer's Hypothetical Advertisement

In the following hypothetical, an attorney publishes advertisements via social media related to VAWA relief. The advertisements are short. One advertisement guarantees immigrants can adjust without leaving the country, even if they had a deportation, and that normal marital problems can be a basis for this. The other advertisement indicates that this firm has figured out a method for immigrating without leaving the country that other firms have not and stating a client will definitely get a green card within two years. None of the advertisements mention "VAWA" or the legal requirements for VAWA.

AILA Doc. No. 21050639. (Posted 5/14/21)

## The Violence Against Women Act

Under VAWA, certain immigrants can file a "self-petition" to U.S. Citizenship and Immigration Services if they have been battered or subjected to extreme cruelty by a U.S. citizen or lawful permanent resident spouse or by a U.S. son/daughter age 21 or over. The self-petitioner must also prove they were married in good faith, subjected to abuse during the marriage, resided with the abuser, and are a person of good moral character. A VAWA self-petitioner subjected to battery or extreme cruelty by a spouse can file up to two years after the death of or divorce from the abusing spouse.

The VAWA regulations provide an open-ended definition to what constitutes battery or extreme cruelty.

> For the purpose of this chapter, the phrase "was battered by or was the subject of extreme cruelty" includes, *but is not limited to*, being the victim of any act or threatened act of violence, including any forceful detention, which results or threatens to result in physical or mental injury.[1] (*Emphasis added.*)

The evidentiary standard for VAWA petitions is "any credible evidence."[2] In addition to primary evidence, such as a police report made by a VAWA petitioner describing an attack, attorneys can use any other probative or supportive evidence.

An approved VAWA self-petition provides the applicant with a work permit, deferred action status, and the ability to apply for lawful permanent residence. Additionally, there are exceptions to common grounds of inadmissibility for VAWA petitioners who are applying for lawful permanent residence. In some circumstances, the three- and ten-year unlawful presence bars will not apply,[3] and the "permanent bar" can be waived.[4] Additionally, applicants may adjust status under INA §245(a) if they entered without inspection, obviating the need to leave the United States to obtain permanent residence.[5]

## The Ethics of Communicating About Legal Services

ABA Model Rule (MR) 7.1 states "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading."[6] A misleading statement is defined in the comments to the rule as creating "a substantial likelihood that it will lead a reasonable person to formulate a factual foundation."[7] Further, "[a] communication that truthfully reports a lawyer's achievements on behalf of clients or former clients may be misleading if presented so as to lead a reasonable person to form an unjustified expectation that the same results could be obtained for other clients in similar matters without reference to the specific factual and legal circumstances of each client's case."[8]

Additionally, federal regulation at 8 CFR §1003.102(f), tracks the Model Rules.[9]

## Do the Advertisements Violate the Rules of Professional Conduct?

It would be difficult to argue that the advertisements are not misleading, and one might even argue that they contain false statements. There is no mention in the advertisements that relief is premised upon a finding of battery or extreme cruelty or that waivers for the grounds of inadmissibility (*e.g.*, previous deportation) require a finding that the grounds are connected to the battery or extreme cruelty. Further, few would characterize battery or extreme cruelty as normal marital problems.

It would be a struggle to factually substantiate the assertions in the comparisons to other lawyers or to justify the expectations that such comparisons may create in clients, namely, that every other lawyer is wrong, that this attorney is correct, and that this attorney wins all cases. These statements give the impression that this kind of process is the rule rather than the exception or that the lawyer has figured out a solution that other lawyers have not. They will likely give rise to unjustified or unrealistic expectations about what the lawyer can do for potential clients. Even if true, statements presented in this fashion regarding other clients in similar matters, without reference to the specific factual and legal circumstances of each client's case, may be misleading.

Certainly not every potential client can adjust status if he or she entered without inspection or has a deportation order. In all likelihood, the majority of potential clients may not be able to adjust at all. Therefore, the advertisements are misleading. It would be an improvement to use less certain language, such as "You *may* be able to adjust status in the United States even if you came illegally or have a deportation order."

---

1   8 CFR 204.2(c)(1)(iv).
2   8 CFR 204.2(c)(2).
3   INA §212(a)(9)(B)(iii)(IV) referencing §212(a)(6)(A)(ii). There must be a substantial connection between the unlawful presence and abuse.
4   INA §212(a)(9)(C). There must a connection between the triggering removal, departure or re-entering, and the qualifying abuse.
5   Memo, Aytes, Assoc. Director, Domestic Operations, USCIS, HQDOMO 70/23.1 (Apr. 11, 2008), AILA Doc. No. 08042161.
6   We use the ABA Model Rules in this article. See Rule 8.5 to determine which state rules apply.
7   ABA Model Rule 7.1, Comment 2.
8   MR 7.1, Cmt. 3; it continues "Similarly, an unsubstantiated claim about a lawyer's or law firm's services or fees, or an unsubstantiated comparison of the lawyer's or law firm's services or fees with those of other lawyers or law firms, may be misleading if presented with such specificity as would lead a reasonable person to conclude that the comparison or claim can be substantiated."
9   This regulation provides rules and procedures regarding professional conduct of practitioners in Immigration matters and grounds for discipline by the BIA.

## A Hazardous Path

A potential client, excited by a misleading proposition of filing for status without leaving the country, is now meeting with the lawyer,[10] who could of course correct the relationship by carefully screening all clients who are not eligible for relief under VAWA. But the client-lawyer relationship is arguably poised to travel down a longer road of ethics violations if the immigration lawyer were to: conduct the consultation with both spouses present and suggest that VAWA is appropriate for one of them; continue with the suggestion that normal marital difficulties are sufficient for a VAWA application; or even induce clients to misrepresent the facts of their situation and apply for relief.

Working with victims of violence and domestic abuse warrants special and often vital considerations. VAWA self-petitioners are among the most vulnerable immigrants as their emotional well-being and physical safety are at risk. Attorneys should consider this when fulfilling duties pursuant to MR 1.4 (Communication).[11]

Before consulting with potential VAWA clients, lawyers should become familiar with the legal requirements for VAWA and be able to analyze the underlying facts particular to each client's situation under those requirements. This includes understanding what may constitute "battery or extreme cruelty" and being able to adequately explain those requirements to the client. The lawyer should also understand how and when certain grounds of inadmissibility may be waived if the actions triggering those grounds are sufficiently connected to abuse.

If the attorney simply advertises that common everyday marital problems qualify you for a work permit, travel document and green card, despite entering without inspection, being removed from the United States, or being subject to the permanent bar, then a claim may be brought that the attorney simply does not possess the knowledge, skill, thoroughness, and preparation reasonably necessary to file VAWA claims.[12]

There is a clear conflict of interest if a lawyer meets with and/or intends to work with both the abused and the abuser in VAWA cases. If the attorney consults with both parties to the potential VAWA case (abuser and victim), it is likely that both parties may perceive that an attorney-client relationship has been established and the lawyer represents them jointly.

True informed consent for a waiver of the conflict in this situation would require the lawyer explain the legal requirements of VAWA, that the abuser will be identified to DHS officials, and that a written record of actions giving rise to a VAWA claim will be made.

Some conflicts are not waivable even when the abuser gives consent if the lawyer reasonably believes that they will never be able to competently and diligently represent each affected client.[13] Moreover, the lawyer may have to advise the victim about reporting the abuser to the police or filing for a protection order. A waiver under these circumstances is untenable when the representation involves the assertion of a claim by one client against another client.[14] It is thus prudent for the lawyer to represent solely the VAWA self-petitioner rather than engage in joint representation of both spouses.

All of this does not even address the dangerous issues inherent in consulting with and representing both abuser and victim, such as revictimization of the survivor or causing the victim to feel trapped and compelled to stay with the abuser, thus defeating the purpose of the self-petition and keeping the victim in a dangerous situation.

For all of these reasons, attorneys should not consult with both parties to a potential VAWA claim. If the lawyer intends to screen primarily for VAWA then the lawyer should consult with the immigrant only, and not the couple together. This should be addressed when scheduling the appointment to avoid confusion and confrontation later on.

Assume that the lawyer meets with just the immigrant, screens for VAWA without suggesting the client make certain claims that would qualify, and finds after their discussion that the potential client may meet the requirements of a VAWA claim. The lawyer must then investigate that claim thoroughly in order to only file cases with "a basis in law and fact . . . that is not frivolous [or warrant] a good faith argument for an extension, modification or reversal of existing law."[15] Attorneys should, as a matter of practice and common sense, assume that they cannot knowingly submit any information on Form I-360, or in any and all documentation submitted in support of such applications, that is fabricated or otherwise not true in fact.[16]

## Philosophy of Lawyering

Attorneys often seek to justify their actions as falling within a duty to "zealously" represent their clients. But the Model Rules actually require attorneys to be competent, truthful, and diligent: not "zealous."[17] The rules presuppose a larger

---

10  Regardless of whether a formal engagement is initiated, the lawyer who charges for the consultation has accepted a fee—and the client has spent money—relying upon the false/misleading advertisement.
11  A lawyer shall "reasonably consult with the client about the means by which the client's objectives are to be accomplished." MR 1.4(b), Communication, states "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."
12  MR 1.1, Competency, requires a lawyer provide "the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." See also 8 C.F.R. § 1003.102(o).
13  MR 1.7(b)(1).
14  MR 1.7(b)(3).
15  8 C.F.R. §1003.102(j). This rule also similarly prohibits actions a lawyer "knows or reasonably should have known that his or her actions lack an arguable basis in law or in fact."
16  If a lawyer submitted information he later discovered to be fabricated or untrue, he would have an obligation to correct the record in most circumstances under MR 3.3 and 8 CFR 1003.102(c).
17  No rule requires zeal. It is referenced in the Preamble's comments, offset by responsibilities to the legal system. Preamble comment 1: a lawyer is an officer of the legal system.  Preamble comment 8: a lawyer "can be a zealous advocate" but also has responsibilities as an officer. Preamble comment 9: a lawyer's obligation to "zealously to protect and pursue a client's legitimate interests" exists only

legal context beyond direct representation of the client, and that, while lawyers have certain duties in the advocate role, they retain certain duties in their role as an officer of the court and in the truth-finding process more generally. While lawyers may certainly represent a client with zeal (exceeding minimum standards of diligence and competence) if they choose to do so, they may not rely upon this as an excuse for unethical conduct.

An attorney may also counter that they have not engaged in a frivolous filing due to a high success rate. While there may be some validity to this statement, success is a marker of effective advocacy, *not* of compliance with rules, which look to acts and conduct, not results or purported intentions. It is the acts and conduct of an attorney, not success rates, that can violate ethical rules and form the basis for disciplinary action.

Lawyers have broad discretion in how to market their practices. The advertising rules generally prohibit false or misleading communications regarding the services a lawyer provides.[18] From this foundation, rules vary significantly on the detail with which authorities regulate how lawyers may let the public know about the services they provide. Some advertisements are clearly false and misleading while others are more difficult to judge. The individual lawyer must decide how close they are willing to get to the line. Lawyers who cross the line run a risk of discipline, including suspension and disbarment. Further, they risk damaging the profession, client confidence in lawyers generally, and in the case of VAWA, misleading advertisements could lead to a higher scrutiny and disintegration or corruption of the important protections such provisions engender.

With advertising and marketing, opinions also play a significant role. An advertisement might clearly be permissible under the rules but nonetheless offensive to other lawyers and the public. Some advertisements might tend to give clients ideas that would increase the possibility of fraud, but also serve an important role in educating clients about possible avenues of relief. Some lawyers might find using new forms of social media distasteful, while other lawyers believe this is a way of educating members of the public who would otherwise remain uninformed and in the dark. In any case, lawyers must also be mindful about the fact that VAWA is a generous form of relief that Congress has provided to noncitizens deserving of protection from abusive family members without needing to rely on the abuser as a sponsor of the green card benefit. The cheapening and trivializing of VAWA relief may result in Congress making VAWA relief more restrictive if there is perception that the system is being abused.

Lawyers should have their own written philosophy of lawyering to guide them with these decisions.[19] In drafting a philosophy of lawyering,[20] lawyers should consider their own moral values, as well as the broader context of standards of professionalism.[21] For example, the State Bar of Georgia's Lawyer's Creed calls upon lawyers to:

> [C]onsider the effect of [their] conduct on the image of our systems of justice including the social effect of advertising methods. As a professional, [they] should ensure that any advertisement of [their] services: (1) is consistent with the dignity of the justice system and a learned profession; (2) provides a beneficial service to the public by providing accurate information about the availability of legal services; (3) educates the public about the law and legal system; (4) provides completely honest and straightforward information about their qualifications, fees, and costs; and (5) does not imply that clients' legal needs can be met only through aggressive tactics.[22]

When a lawyer notices a colleague's marketing may be inappropriate or even beyond what professional standards allow, a good first step may be to pick up the telephone.[23] The lawyer might not be aware that he or she has stepped across the line and appreciate a call rather than a report to the bar. Another way of addressing these issues more generally is to become more involved in the development of the legal profession, *e.g.*, teaching or mentoring fellow lawyers or actively participating in bar associations such as AILA. But if a lawyer's conduct "raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer,"[24] ethics rules in many jurisdictions require a lawyer to inform authorities.

Attorneys can, and should, file a petition under the VAWA where the facts and circumstances warrant. However, the purpose of a VAWA petition is to protect self-petitioners from abuse—not to assist married couples in circumventing the INA. Rather than focus on making conclusory statements regarding a theory of eligibility that is seemingly at odds with

---

"within the bounds of the law"; conflicts arise between the lawyer's responsibilities to clients and to the legal system, and such conflicts are resolved by reference to the rules. MR 1.3 Comment 1: a lawyer should use "whatever lawful and ethical measures are required," using "zeal in advocacy," but the lawyer is "not bound, however, to press for every advantage that might be realized." See also *ABA Division for Public Education: How Courts Work: Steps in a Trial: Officers of the Court*: "The lawyers for both sides are also officers of the court. Their job is to represent their clients zealously, within the formal rules of the Code of Professional Conduct. The belief is that justice can best be achieved if each side's case is vigorously presented by competent legal counsel."

18   See ABA Model Rule 7.1.
19   See Kenneth Craig Dobson, *Yes, No, or Maybe: The Importance of Developing a Philosophy of Lawyering in an Era of Immigration Upheaval* (AILA Doc. No. 17092930) (2017).
20   Nathan M. Crystal, *Developing a Philosophy of Lawyering*, 14 Notre Dame J.L. Ethics & Pub. Pol'y 75 (2000).
21   See, e.g., State Bar of Georgia, Lawyer's Creed and Aspirational Statement on Professionalism;
22   NYCRR Part 1200, Appendix, A, STANDARDS OF CIVILITY; and SCACR 402(h)(3), Lawyer's Oath.
22   State Bar of Georgia, Lawyer's Creed and Aspirational Statement on Professionalism, https://www.gabar.org/aboutthebar/lawrelatedorganizations/cjcp/lawyers-creed.cfm (last accessed April 12, 2021).
23   "As to my colleagues in the practice of law, I will aspire: (a) To recognize and to develop our interdependence; (b) To respect the needs of others, especially the need to develop as a whole person, and, (c) To assist my colleagues become better people in the practice of law and to accept their assistance offered to me." State Bar of Georgia, Lawyer's Creed and Aspirational Statement on Professionalism.
24   ABA Model Rule 8.3.(a).

the actual legal standard, attorneys are on far safer ground by alluding to the possibility of relief and providing appropriate disclaimers: for example, "if you have been abused by a spouse, parent, or adult child that is a U.S. citizen or lawful permanent resident, there may be ways to fix your status."

When crafting advertising on social media, keep in mind the following suggested best practices:

- Do not compare and/or contrast your practice with other attorneys.
- Do not provide specific client-related advice over social media.
- Encourage private consultation to discuss specifics of case.
- For VAWA consultations, the abusive spouse should not be present.
- Stress the confidentiality of communications and information provided.

If your social media message conflicts with these best practices, you may want to consider whether the risk of discipline requires a more conservative, if less trendy, use of social media advertising.

Improving your competence to handle VAWA cases inures to your benefit and lessens the chance of investigation by disciplinary counsel. You can increase your competence through diligent study and by seeking outside expert assistance. If you are considering increasing your VAWA practice, resources are available through AILA.

The Mentor Directory provides real-time, mid-case assistance to assist with your research. (The VAWA section is housed under the 'asylum and removal' section.) Every mentor is an AILA member experienced in that area of practice.

Additionally, AILA collaborates with the Immigration Justice Campaign as a clearinghouse for volunteer (pro bono) opportunities, which are a great way to gain support, training, and mentorship through resourced organizations. Please also consider the articles The Five Steps to Building Business Through Pro Bono and Connecting with Mentors and Colleagues: A Roadmap for Building Solid Professional Relationships.

Lastly, we note that because mentorship is often a local need with local support, your AILA chapter may well have mentoring programs available in the VAWA context.

